In re EMERALD OIL
COMPANY, Debtor.

William C. SANDOZ, Trustee in
Bankruptcy, Plaintiff,

v.

David S. BENNETT, Defendant.
(Two Cases)

William C. SANDOZ, Trustee in
Bankruptcy, Plaintiff,

v.

Sam P. BENNETT and David S.
Bennett, Defendants.

Bankruptcy No. 480–00233–LO.
Adv. Nos. 480–0070, 482–0097
and 482–0101.

United States Bankruptcy Court,
W.D. Louisiana.

Jan. 11, 1984.

Gerald H. Schiff, Sandoz, Sandoz & Schiff, Opelousas, La., for trustee.

James R. Jeter, Cook, Yancy, King & Galloway, Shreveport, La., for Wheless Drilling Co., et al.

Vance R. Andrus, Lafayette, La., for Mr. and Mrs. David S. Bennett.

W. Simmons Sandoz, Opelousas, La., trustee.

Patrick S. Ottinger, Lafayette, La. for defendant, Sam P. Bennett.

## OPINION

RODNEY BERNARD, Jr., Chief Judge.

The trustee filed an application to compromise the three (3) above captioned adversary proceedings on February 16, 1983. Objections to the proposed compromise were timely filed by Wheless Drilling Company, Newpark Drilling Fluids, Inc. and Aztec Corporation, all creditors of Emerald Oil Company, the debtor herein. Another timely objection was filed by Explorer Drilling Company, Inc., also a creditor of Emerald. All of the objecting creditors are members of the creditors' committee in this Chapter 11 proceeding. The proposed compromise agreement is the subject of this opinion.

### Statement of the Case

The debtor is a Delaware corporation qualified and doing business in Louisiana. Its principal place of business is in Lafayette Parish, Louisiana. The debtor is engaged in the business of turnkey contract drilling for oil and gas.

On May 16, 1980, the debtor voluntarily filed its petition for relief under Chapter 11 of the Bankruptcy Code (11 U.S.C. §§ 1101–1146). Upon filing the petition for relief, the debtor was immediately continued in possession and operation of its business as a debtor in possession. Thereafter, on August 11, 1980, William C. Sandoz was appointed as trustee in the case.

The trustee, on behalf of the debtor and its estate, filed three separate complaints against the principals of the debtor corpo-ration. Accordingly, three different adversary proceedings were instituted. These adversary proceedings have been consolidated for the ease of judicial administration.

The principals of the debtor corporation are Sam P. Bennett and his wife, David S. Bennett. Mr. Bennett is President of the debtor corporation and holds a 50% equity security interest. Mrs. Bennett is Vice-President of the corporation and holds the other 50% equity security interest.

Mr. Sandoz, through his attorney, filed the first complaint against David S. Bennett (Mrs. Sam P. Bennett) on August 25, 1980. He seeks to avoid an allegedly fraudulent conveyance pursuant to 11 U.S.C. § 548. Particularly, the trustee seeks to recover from the defendant a working interest or the value of the working interest in a completed oil and gas well known as the Williams B No. 1 Well, located in the Mystic Bayou Field, St. Mary Parish, Louisiana.

On July 27, 1982, the trustee filed the second complaint against David S. Bennett seeking to recover moneys due the debtor's estate that allegedly comprise accounts receivable of the debtor corporation. The accounts receivable owing to the debtor allegedly arise from costs for drilling that were paid by Emerald Oil on the defendant's behalf.

The third adversary proceeding was instituted August 4, 1982. The defendants are Sam P. Bennett and David S. Bennett. The complaint seeks to pierce the "corporate veil" on grounds that the corporation was undercapitalized by its principal shareholders. The prayer for relief contained in the pleadings asks for recovery against defendants of an amount equal to the difference between the assets of the corporation and the debts of the corporation.

The original adversary proceeding was fixed for trial in early 1983. After extensive discovery, collateral litigation, and exhaustive negotiations a tentative compromise was reached by the parties. The trustee filed an application to compromise

these three adversary proceedings on February 16, 1983. In due course, a hearing on said application to compromise the adversary proceedings was held March 29, 1983. Timely objections to the application to compromise were filed by several members of the official creditors' committee. At hearing, the trustee recommended approval and adoption of the proposed compromise agreement. The defendants concurred with the trustee's recommendation. The only opposition presently pending is that filed by the various members of the creditors' committee.

At the conclusion of the March 29, 1983 hearing, the court ordered that the record remain open for receipt of certain documents that could not be produced at the time. Specifically, for receipt of the production payment agreement that forms the basis of the compromise agreement, and for receipt of two letters that were jointly offered. The two letters are authored by William L. Craig, a geologist and petroleum engineer, who served as a minerals appraiser for the trustee. The court acknowledges receipt of the aforementioned documents.

### The Proposed Compromise

The proposed compromise is the result of many months of negotiation. Basically, the compromise agreement confirms the ownership interest in the Williams B No. 1 Well in David S. Bennett. In return, Mrs. Bennett shall grant to the trustee and the debtor's estate a production payment from revenues generated by the well's oil and gas production. The production payment agreement provides that the debtor's estate shall receive 80% of all runs and production generated after the date of settlement from Mrs. Bennett's ⅛ working interest in the well. Mrs. Bennett will receive 20% of all runs and production attributable to her ⅛ working interest. The production payment shall remain in force until the debtor's estate has received $500,000.00 plus interest on the principal sum at Chase Manhattan Bank prime rate of interest plus two percent (2%).

In the event of certain specialized circumstances the percentages are to be reversed. Particularly, if the production should cease and the well should require reworking or redrilling to restore production, the percentages would reverse until Mrs. Bennett recoups her share of the costs for the reworking or redrilling. That is, the debtor's estate will receive 20% of all runs and production and Mrs. Bennett will receive 80% until the costs of reworking or redrilling are recovered. Upon recovery of said costs the percentages will revert to 80% for the debtor's estate and 20% for Mrs. Bennett until the $500,000.00 is recovered by the estate. The same reversal of percentage payments will also occur in the event that a new developmental or exploratory well need be drilled.

The term "production payment" is a term of art in the oil and gas industry. As explained to the court, it refers to a right to receive revenues from production of oil and gas. It grants a portion of all such revenues actually received by one to another, up to a certain amount. The advantage of a production payment is that the grantee is not liable for the attendant costs associated with oil and gas production.

### Standards for Approval of Compromise

■ In determining whether a proposed compromise should be approved, a bankruptcy judge must compare the "terms of the compromise with the likely rewards of litigation". *Matter of Jackson Brewing Co.,* 624 F.2d 599, 602 (5th Cir.1980), citing *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424–25, 88 S.Ct. 1157, 1163–64, 20 L.Ed.2d 1 (1968). This requires an evaluation of the following factors:

(1) The probability of success in litigation, with due consideration for uncertainty in fact and law;

(2) The complexity and likely duration of litigation and any attendant expense, inconvenience and delay; and

(3) All other factors bearing on the wisdom of the compromise.

*Matter of Jackson Brewing Co.*, 624 F.2d at 602.

In comparing the terms of this compromise with the likely rewards of litigation, the court is of the opinion that the application for approval of the compromise should be granted. As the following discussion will show, this compromise is fair, equitable and in the best interest of the estate.

### Probability of Success in Litigation
#### Complaint # 1

The likelihood of the plaintiff succeeding in litigation to recover a ⅛ working interest in the Williams B # 1 Well is doubtful. At the hearing on March 29, 1983, the attorney for the trustee indicated that he and the trustee were of the opinion that there was "an excellent chance of succeeding in this litigation". Tr. of Hrg., March 29, 1983, G. Schiff, p. 9. However, the attorney for the trustee also admitted that there were some very novel legal issues involved in the same litigation. Tr. of Hrg., March 29, 1983, G. Schiff, p. 9–10.

As will be recalled from previous discussion, this litigation involves a complaint seeking to recover a ⅛ working interest in the Williams B No. 1 Well that is alleged to have been fraudulently conveyed to Mrs. Williams by Emerald Oil Company. The novel legal issues that the attorney for the trustee alluded to at the March 29, 1983 hearing, concerned the question of when does a transfer actually occur in the oil and gas industry. Additionally, there was a question concerning adequate consideration.

Many of the transactions in this case were consummated by a gentleman's agreement and a handshake. Counterletters containing the terms of the transfer were issued and kept by the individual parties to the transaction in their private files. The recordation of the transfer of the working interest ownership was not recorded in the public records until some later date. These are some of the countervailing considerations that create the novel issue of exactly when a transfer is deemed to occur in the oil and gas industry and what constitutes adequate consideration.

Even if the trustee could prove at trial that a fraudulent conveyance occurred, it is probable that these unresolved legal issues would result in numerous appeals. While there is greater likelihood of succeeding in litigation on this claim than on the other two, the value of this claim, its attendant costs, and other factors as discussed below still justify approval of the proposed compromise.

#### Complaint # 2

The likelihood of the plaintiff succeeding in litigation to recover on the alleged account receivable owed by Mrs. Bennett to the debtor's estate is extremely doubtful. The suit seeks to recover a total of some $323,000 plus interest. The total amount that is claimed to be due and owing consists of five (5) separate invoices. Of the total amount claimed approximately $264,-000.00 is in serious dispute. This amount is represented by two separate invoices. Another invoice for $51,250.00 is for costs related to the Williams B No. 1 Well. Mrs. Bennett's liability for this particular invoice is contingent upon the result of litigation in Complaint # 1, discussed above. If the trustee should be successful in that litigation and recovers the ⅛ working interest now held by Mrs. Bennett, she would owe nothing because she would have received no benefits related to the invoice. On the other hand, she would be obligated for the costs if the trustee was unsuccessful in that litigation because Mrs. Bennett would retain ownership of the ⅛ working interest.

The collectability of the amount claimed is even more doubtful than the trustee's ability to prevail on the merits of the complaint. Therefore, these factors justify approval of the compromise.

#### Complaint # 3

The likelihood of the trustee succeeding in litigation on Complaint # 3 is also extremely doubtful. The attorney for the trustee admitted at the hearing that this

was the weakest of the three complaints filed by the trustee. Tr. of Hrg., March 29, 1983, G. Schiff, p. 13. The suit is based in tort. It is an attempt to pierce the corporate veil, and to have Mr. and Mrs. Bennett held liable to the debtor estate for a breach of fiduciary duties in their capacity as officers, shareholders, and directors of the corporation.

■■■ Absent fraud, such circumstances as commingling of funds, failure to follow statutory formalities for incorporation and transacting corporate affairs, and undercapitalization may warrant piercing the corporate veil. *Kingsman Enterprises Inc. v. Bakerfield Electric Co., Inc.*, 339 So.2d 1280 (La.App. 1st Cir.1976). However, when no fraud is proven, the totality of these other circumstances "must be so strong as to clearly indicate that the corporation and shareholder operated as one". *Id.* at 1284. Proof of inadequate capitalization does not, of itself, indicate fraud. *McGregor v. United Film Corp.*, 351 So.2d 1224, 1229 (La.App. 1st Cir.1977).

It does not appear from reviewing the record that the trustee has such strong evidence to support his claim. Again, it appears very doubtful that the plaintiff has sufficient evidence to succeed in litigation on this theory.

### Complexity, Duration, Expense, Inconvenience and Delay of Litigation

■■ Even if the plaintiff were able to overcome the problems of proof discussed above and succeed in his claims for recovery of property, the possibility of such recovery being worth substantially more than $500,000.00 plus interest is highly uncertain.

As previously mentioned, litigation on claim #1 is complicated by novel issues of law and fact. Particularly, the questions of when do you value the property and what constitutes adequate consideration.

While Complaint #1 might be the most likely of the three complaints to be successfully litigated, its successful or unsuccessful completion at trial is likely to result in numerous appeals. If the complaint is brought to trial, there will necessarily be a winner and a loser. By approving this compromise all will benefit to some degree and there will be no absolute loser.

The first complaint is ready for trial. All discovery is completed. As a matter of fact, it has been set for trial twice and has twice been continued. This litigation has been conducted for several years now. It has been expensive not only for the estate but also for the defendants and the objecting creditors. The expense will continue to increase if taken to trial. It is estimated that a trial would last three to four days. Appeals would likely follow the trial and it might be several more years before the litigation terminates. By succeeding in litigation on Complaint #1, the trustee would recover a ⅛ working interest in the Williams B No. 1 Well. By participating in a well as a working interest owner, one assumes the attendant obligations and risks of operating a well. Whereas, participation in a production payment is not burdened by the obligations of drilling costs, reworking costs, and development or re-development costs.

The only risk accompanying the production payment proposal is that there may not be $500,000.00 worth of reserves in the ground. The speculative value of reserves is an inherent risk in any oil and gas investment. At present, the well is shut in. The estate will receive no production payment until production resumes. Therefore, the money is in the bank, so to speak, since the oil and gas is still in the ground. The amount of gas in the ground and the price to be received at market is, of course, speculative.

Under the terms of the compromise agreement, the trustee on behalf of the estate, will continue to receive production payments until the full $500,000.00 plus interest is realized. The court is of the opinion that receipt of $500,000.00 for the benefit of the estate's creditors without the attendant obligation for costs of operating a well is in the better interest of all parties,

than to assume the risk of receiving nothing after exhaustive litigation.

As regards the other two complaints, the likelihood of success is extremely doubtful. The ability to collect any judgment arising from successful litigation of those complaints is even more doubtful. Discovery has not been completed in either of the two cases. Therefore, it would require additional expense and time to bring either complaint to trial.

The court is well aware of the extent and duration of this litigation and the great expense involved to date. More importantly, the nature of the compromise is such that Emerald Oil Company does not become saddled with the burdens of a working interest owner, but rather Mrs. Bennett retains those obligations herself. If there is additional oil and gas to be discovered upon the subject tract, then Emerald Oil and its creditors will certainly benefit from it without undue exposure. On the other hand, if there is no further oil or gas to be discovered on the property, then the litigation in which the trustee seeks to obtain title will have been for naught anyway.

### Other Factors Bearing on the Wisdom of Compromise

The court has recently been informed that the reason for the Williams B No. 1 Well being shut in is a consequence of Dow Chemical Company's alleged refusal to purchase gas under the terms of a gas purchase contract with the various working interest partners in the well. The court has also been informed that a substantial claim exists against Dow Chemical Company for its alleged failure to buy the gas. Any potential claim against Dow Chemical Company cannot be asserted until a final decision is reached on the proposed compromise at issue here.

Given the fact that there exists a substantial claim under the gas purchase contract, that the estate would be well served by this compromise, that this is an extremely complex matter of both law and fact in these various adversary proceedings, that there is a multiplicity of litigation involved,

and that the risk of loss is great to either side, the compromise agreement should be approved as written.

The trustee is authorized to execute any and all documents necessary to effect the compromise. All objections to the compromise are hereby overruled.